**SHEREE D. WRIGHT (**AZ SBN# 035265)
IBF Law Group, PLLC
3101 N. Central Ave, Suite 1250
Phoenix, Arizona 85012
Telephone: (602) 833-1110
Facsimile: (602) 800-5701
E-Mail: sheree@ibflaw.com

**CORTNEY E. WALTERS** (*pro hac vice* pending)
The Law Office of Cortney E. Walters, PLLC
2719 Hollywood Blvd., Suite A-1969
Hollywood, FL 33020
Telephone: (954) 874-8022
Facsimile: (954) 889-3747
E-Mail: cwalters@cewlawoffice.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Gene Traylor, an individual<br><br>    Plaintiff,<br><br>vs.<br><br>Sports & Entertainment Services, LLC, an Arizona limited liability company, dba Phoenix Suns; Suns Legacy Partners, LLC, an Arizona Limited Liability Company; John Doe 1-5; Jane Does 1-5; Black Corporations 1-5; and White Partnerships 1-5,<br><br>    Defendant, | Case No.:<br><br>**COMPLAINT**<br><br>**PLAINTIFF DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE** |

Plaintiff Gene Traylor (hereinafter "Plaintiff" or "Mr. Traylor"), by and through his undersigned counsel, as and for his Complaint in this action against Defendant Suns Legacy Partners, LLC (hereinafter "Defendant Suns" or "Defendant"), hereby alleges:

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 1343 and 42 U.S.C. §2000e-5(f) as this action involves federal questions regarding the deprivation of Plaintiff's civil rights under Section 1981, Title VII, the Family and Medical Leave Act, and the Americans with Disabilities Act.

2.    The Court has supplemental jurisdiction over Plaintiff's related claims arising under state and local law pursuant to 28 U.S.C. § 1367(a).

3.    Venue is proper in this district pursuant to 28 U.S.C. §1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices herein, occurred within this judicial district.

## PARTIES

4.    Plaintiff is an individual domiciled in Maricopa County, Arizona and at all times material to this action, was an employee of Sports & Entertainment Services, LLC, an Arizona limited liability company, dba Phoenix Suns and Suns Legacy Partners, LLC (hereinafter "Defendant," "Defendants" or "Defendant Suns").

5.    Defendants are corporations engaged in business operations in Maricopa County,

Arizona, and were Plaintiff's employers as defined under 29 U.S.C. § 203(e)(1) of the Fair

Labor Standards Act (FLSA).

**6.**     Defendant Suns, John Does 1-5, Jane Does 1-5, Black Corporations 1-5, and

White Partnerships 1-5 (hereinafter "fictitious defendants") were, at all times material

herein, principals and/or employers of one another and were acting as agents, servants, or

employees within the scope of their agency or employment. As soon as their true names

become known, Plaintiff will amend this Complaint accordingly. Said fictitious

defendants should be held liable to Plaintiff for their actions and the actions of any

affiliated or subsidiary entity under their control under the theories of respondeat superior,

agency, equitable estoppel, and other applicable law.

## NATURE OF THE CLAIMS

**7.**     This action seeks declaratory, injunctive, and equitable relief, as well as monetary

damages, to address Defendant's unlawful employment practices against Plaintiff. These

practices include discrimination and harassment based on race, as well as unlawful

retaliation following the Plaintiff's complaints about workplace discrimination in violation

of Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866,

42 U.S.C. §1981 ("Section 1981"), the Family and Medical Leave Act, the Americans with

Disabilities Act,  and the Arizona Civil Rights Act (ACRA), A.R.S. §41-1401 to §41-

1493.02.

## ADMINISTRATIVE PROCEDURES

**8.**      Prior to the filing of this Complaint, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq*. ("Title VII"). Plaintiff's EEOC charge arises out of many of the same facts alleged herein that pertain to his Section 1981 retaliation claim.

**9.**      On February 17, 2025, the Arizona Civil Rights Division issued the Notice of Right to Sue letter, granting  Plaintiff the opportunity to pursue his case in state court.

**10.**      On April 25, 2025, the U.S Equal Employment Opportunity Commission issued the Notice of Your Right To Sue.

**11.**      Plaintiff has exhausted all administrative prerequisites to filing suit in this Court.

## FACTUAL ALLEGATIONS

**12.**      Plaintiff is a certified ASIS International Certified Protection Professional (CPP), a distinguished credential demonstrating extensive experience in asset protection and security leadership.

**13.**      To attain this certification, an individual must possess a minimum of five years of experience in security management, alongside a proven track record of decision-making expertise. Plaintiff began employment with Defendant on January 23, 2023, as the Director of Safety, Security, and Risk Management. Plaintiff's direct supervisor at the time was Vanessa Ward, Vice President of Event Services.

**14.**      One of Plaintiff's primary duties was to evaluate the Defendant's safety, financial, and reputational risks. Upon conducting this assessment, Plaintiff quickly identified key

areas within the organization that were compromised and urgently needed corrective action. With this insight, Plaintiff developed the Enterprise Security Risk Management framework ("ESRM").

### The ESRM Framework Highlighted Critical Vulnerabilities and Misconduct Within Defendant's Workplace

**15.**    The Enterprise Security Risk Management framework (ESRM) was developed as a presentation to highlight critical areas within the Defendant's organization that required improvement.

**16.**    The primary purpose of the ESRM was to emphasize the necessity of implementing an infiltration-proof security system capable of preventing, or at the very least minimizing, potential harm. Plaintiff clearly stated in the ESRM, **"The Safety & Security Team is committed to protecting our assets (people, property, product) while embedding, sustaining, and supporting a culture of responsible risk-taking and opportunity identification across the organization."**

**17.**    The ESRM presentation outlined various threats to Defendant's organization, with three primary concerns standing out: the potential impact on revenue, the risk to the brand and reputation, and the possibility of injury or death to team members or players. Plaintiff sent the ESRM to Ward for review.

**18.**    After meeting with Plaintiff to discuss the report, Ward expressed that she did not fully understand its content and requested that Plaintiff forward it to Ralph Marchetta, former Vice President & General Manager, and Kim Corbitt, Senior Vice President of People & Culture.

**19.**    It is crucial to note that Plaintiff reasonably believed that neither Ward, Marchetta, nor Corbitt had any experience in security, a factor that would later contribute to the risks the organization faced.

**20.**    As time passed, neither Marchetta nor Corbitt responded to the ESRM report, and Plaintiff's concerns regarding Defendant's organization grew. On April 16, 2023, Josh Bartelstein, Chief Executive Officer, was approached and harassed by a disgruntled individual at a Defendant-hosted photo op event.

**21.**    Later, on June 10, 2023, Brittney Griner, former Phoenix Mercury player, was harassed by a political influencer at the Dallas/Fort Worth airport. Defendant's security team was not included in the initial event planning for either instance.

**22.**    In December 2023, Plaintiff met with Bartelstein and Corbitt to present the ESRM. At the conclusion of the presentation, Bartelstein's initial remarks indicated what was to happen next. **"Who all knows about this complaint?"** he asked the Plaintiff. Plaintiff clarified that the ESRM was not a complaint, but a presentation aimed at strengthening the organization's security posture. Bartelstein quickly concluded the meeting, stating that he and Corbitt would handle it. Shortly after, Marchetta and Ward were made aware of the Plaintiff's meeting with Bartelstein and Corbitt regarding the ESRM.

**23.**    Instead of considering these serious warnings and implementing the necessary changes, Defendant—particularly Ward—perceived the presentation as a criticism of her own performance, particularly regarding her lack of attention to detail, security knowledge, and efficiency.

**24.**   Plaintiff's ESRM presentation also highlighted financial misconduct within the organization. Specifically, Plaintiff presented evidence that expensive lunches and Amazon orders had been charged to the security department—under Plaintiff's supervision—yet these purchases were not made for his department. It became clear that the Defendant's agents intentionally mislabeled the purchases to conceal their origin.

**25.**   Additionally, Plaintiff raised concerns regarding the frequent swapping of Defendant's credit cards between numerous employees within the organization. Ward responded by dismissing the matter, stating, **"This is not in your wheelhouse,"** effectively telling the Plaintiff to stop investigating the financial harm to the organization.

**26.**   Another critical issue Plaintiff revealed was a potential conflict of interest within the organization. Defendant had been making donations to the Native American Basketball Invitational ("NABI"), which GinaMarie Garcia Scarpa, the principal owner, leads.

**27.**   **It was later discovered that Marchetta and Scarpa were married, prompting Plaintiff to recognize the clear potential for a conflict of interest.** Plaintiff believes that Defendant was keen on ignoring this conflict, encouraging him to disregard this issue entirely.

**28.**   At no point did Defendant truly understand or appreciate how seriously Plaintiff took their organization's safety, nor did they seem to want him to care that much. In response, Defendant orchestrated an effort to terminate Plaintiff.

**29.**    It is worth noting that Defendant does not treat non-Black directors with the same disdain nor coordinate efforts to demote them. This became evident when Defendant hired Cornelius Craig, Vice President of Security and Risk Management.

**Cornelius Craig's Hiring Was Intended to Disrupt Plaintiff's Role in the Workplace**

**30.**    Defendant frequently resorts to the shameful and pathetic defense, "How can it be racial discrimination if the supervisor or manager is Black?" The answer is clear: **it is racial discrimination when a Black supervisor or manager is explicitly hired to target Black employees at the behest of racist executives.**

**31.**    On October 1, 2024, around 3:00 PM, after Defendant became aware that Plaintiff was likely preparing to file an EEOC complaint, Bartelstein called Plaintiff. At this point, Corbitt, Jessica McNeese, Joy Harper, Michael Hertel, members of the People & Culture team, were fully aware of the disparate treatment Plaintiff had been facing. It is reasonable to believe that Defendant knew other employees were also considering filing their own EEOC complaints.

**32.**    During the call, Bartelstein asked Plaintiff about his concerns regarding Craig. When Plaintiff replied, **"Cornelius is a problem for me and the security team,"** Bartelstein responded straightforwardly, saying **"Talk to me, Gene, give me a reason to fire him."** Following this conversation, Plaintiff and Bartelstein scheduled an in-person meeting at the office.

**33.**    On or about October 9, 2024, Craig called Plaintiff at approximately 6:27 PM. Craig spoke in a frantic tone. Prior to this call, Craig was fully aware that Plaintiff had filed

complaints against him. During the call, Craig verbatim stated, **"I had to do it, they had me by the balls."** When Plaintiff asked Craig to clarify, he explained that, before starting his employment with Defendant, Corbitt and Marchetta had contacted him, **informing him that Plaintiff was considered a threat to the organization and that something needed to be done about him**—essentially implying that it was Craig's responsibility to terminate Plaintiff.

34.    On October 10, 2024, Plaintiff and Bartelstein met, during which the Plaintiff expressed concerns about Craig's behavior, describing it as inappropriate, threatening, and detrimental to the organization. Plaintiff explained that on Craig's first day with the organization, he told the Plaintiff, **"You are being demoted to a Safety & Training Development Leader. I talked to Kim, and I've got everything I need to know about you,"** which clearly indicated that Craig was targeting Plaintiff. Plaintiff also shared with Bartelstein that Craig had been spreading damaging information about him that could jeopardize the organization.

35.    When Bartelstein asked Plaintiff to reveal what Craig was saying, Plaintiff explained that Craig had been telling others, **"Josh Bartelstein is fucking Sophie Cunningham."** Additionally, Plaintiff requested that Bartelstein speak with the security team about Craig's behavior. The Plaintiff further expressed frustration that complaints made to the People & Culture department had not been addressed.

36.    Plaintiff also told Bartelstein that Craig had remarked, **"Your health issues are self-induced."** Bartelstein's attempt to feign ignorance about Craig's behavior was

inexcusable then and remains inexcusable now. Plaintiff believes that Bartelstein was fully aware of the racial discrimination and other inappropriate actions carried out by Defendant's executives.

**37.**    Plaintiff reasonably believes that Bartelstein, along with Corbitt, Marchetta and Ward, specifically hired Craig to target Plaintiff, and it is believed that Bartelstein approved this plan. This will be further elaborated upon later in this Complaint.

### Craig Interfered with Plaintiff's Rights Under the FMLA and ADA

**38.**    In 2023, Plaintiff was diagnosed with cancer. Despite the challenges posed by chemotherapy and multiple surgical procedures, Plaintiff continued to perform his duties at an excellent level.

**39.**    However, as is natural, the physical toll from the treatments and work-related stress began to affect Plaintiff's health. As a result, Plaintiff began the process of requesting leave under the Family and Medical Leave Act (FMLA) and sought work accommodations.

**40.**    On two occasions, Plaintiff attempted to complete the necessary documentation for FMLA leave, but both times, People & Culture informed Craig of the Plaintiff's attempts. Each time the Plaintiff initiated the FMLA process, Craig would threaten the Plaintiff's job security.

**41.**    On one occasion, Craig told the Plaintiff, **"You can be in Hawaii for all I care, as long as you meet your deliverables."** During this vulnerable and emotional period, Craig's threats to the Plaintiff's job security made Plaintiff reasonably fear that exercising his rights to FMLA or requesting ADA accommodations would result in termination.

### The Suns Organization's Discriminatory Conduct Jeopardized the Safety of Players, Fans, and Arena Invitees

**42.** In or around February 6, 2024, Plaintiff completed his quarterly review with Ward. Ward used the review as a pretext to be later used to demote Plaintiff.

**43.** Ward described Plaintiff as a hard to work with individual, a poor communicator, and someone who was not good at their job. The same go-to remarks Defendant habitually resorts to when individuals present discriminatory or other concerns to Defendant.

**44.** Ward sent a follow-up email regarding the meeting and expressed that Craig will be joining the organization and **"will decide the best structure for the security team."**

**45.** On December 17, 2023, the Phoenix Police Department's Homeland Defense Bureau conducted a field test to assess security measures at public venues. As part of the exercise, plainclothes officers attempted to infiltrate Defendant's arena while concealing weapons. The officers successfully bypassed security screening procedures and gained entry using valid game tickets. Notably, two of the officers brought a knife into the arena undetected. Defendant failed the field test, exposing serious deficiencies in its security protocols.

**46.** On December 3, 2024, the Phoenix Police Department's Homeland Defense Bureau conducted another field test. This time, officers concealed various weapons and attempted to breach the entrances of Defendant's arena. Officers successfully brought in two handguns and a knife. Once again, Defendant failed the test—this time with even more alarming results.

47.    Plaintiff raised these serious safety concerns regarding Defendant's persistent security vulnerabilities, but his concerns were disregarded. Defendant interpreted Plaintiff's warnings as boastful or as an affront to Ward's and Craig's authority, rather than as good-faith efforts to protect the organization and its guests.

48.    **In February 2025, when the NBA conducted its own security assessment, Defendant again failed—this time under the leadership of Craig and Corbitt**. The consistent failures across independent evaluations underscore the systemic issues that Plaintiff sought to address and for which he was retaliated against.

49.    Quite frankly, Ward is responsible for overseeing events, Corbitt handles human resources, and Craig has consistently shown a lack of the necessary knowledge and skills to safeguard Defendant's arena.

50.    Despite this, these three individuals are in charge of the arena's security team. This observation is not a reflection of Plaintiff's opinion of their leadership abilities but rather a statement of fact.

51.    Ward, Corbitt, and Craig have jeopardized the safety of thousands of event attendees.

52.    **Defendant's arena is highly vulnerable, and since handguns and knives can be easily brought into the venue, Plaintiff often expressed serious concern about the potential disaster that could unfold if dangerous individuals were to breach security with weapons.**

**53.**   The blood of those victims would rest on Defendant's hands, yet Plaintiff was retaliated against, demoted, and harassed for his efforts to prevent such a catastrophe.

**Ishbia and Bartelstein Authorized the Hiring of Craig to Protect their Reputation**

**54.**   "I'm going to spend a lot of time listening and learning, then make the adjustments to make this not only one of the best organizations in the NBA but also one of the best places to work,"[1] stated Mat Ishbia to *The Associated Press* after acquiring the Phoenix Suns.

**55.**   However, according to both current and former employees, the workplace environment under Ishbia's leadership has deteriorated—even further than under former owner Robert Sarver.

**56.**   Following the acquisition, Ishbia appointed Josh Bartelstein as CEO—a longtime friend dating back to their days in Michigan.

**57.**   Ishbia and Bartelstein acted swiftly to distance the organization publicly from the Sarver era, yet, internally, they retained many of the same executives who were widely regarded as problematic under Sarver's ownership. Despite public promises to implement meaningful change, these statements now appear to have been performative—crafted to protect public image rather than to address the systemic issues within the organization.

---

[1] David Brandt, *Ishbia takes over Suns, works to improve team culture* (February 8, 2023), available at https://apnews.com/article/milwaukee-bucks-brooklyn-nets-phoenix-suns-new-york-knicks-houston-rockets-3f59feda34360905962e1f9ff0bf6cc5

**58.** Numerous employees within Defendant's organization have expressed that Ishbia and Bartelstein are more concerned with optics than substantive change, a perception reinforced by ongoing dysfunction and the absence of accountability for misconduct. After Plaintiff presented the ESRM framework to Bartelstein, Plaintiff became the target of increasing hostility.

**59.** Soon thereafter, Ward grew abruptly dissatisfied with Plaintiff's performance—prompting the hiring of Craig. **Notably, prior to Craig's official start date, he was told that Plaintiff was a problem and that "something needed to be done" about him.**

**60.** Despite serious and repeated concerns regarding Craig, including his reported claim to Defendant's security team that Bartelstein was engaged in a sexual relationship with player Sophia Cunningham, Defendant took no disciplinary action.

**61.** Bartelstein was made aware of this behavior directly and even engaged in a conversation with Plaintiff concerning Craig's conduct. Still, Craig remained employed. Personnel close to the players also reportedly warned leadership about Craig's behavior, yet Ishbia and Bartelstein declined to act.

**62.** At this point, a troubling conclusion emerges: either there was nothing Craig could do that would result in his termination, or **Craig possesses compromising information that shields him from accountability.**

**63.** In either case, the facts strongly support the view that Ishbia and Bartelstein not only deliberately hired Craig, but also knowingly retained him in order to execute a targeted agenda against Plaintiff—whom they viewed as a threat to the organization.

### Phoenix Suns Weaponize Diversity to Mask Discriminatory Practices

64.    As previously stated, Craig was hired with the intention of terminating Plaintiff. However, during several private conversations between the two, Craig made a surprising and impactful admission.

65.    Months before Plaintiff and Craig made efforts to reconcile their strained relationship, **Craig had offered to assist Plaintiff in securing a position with another company**. Plaintiff, understandably hesitant, was reluctant to engage in any discussions about Craig helping him find alternative employment.

66.    Over time, as trust gradually rebuilt between them, Craig began to open up. He revealed his personal conflict and the pressure he faced from upper management, which had caused tension between him and Defendant.

67.    **Craig disclosed that Plaintiff was never meant to be demoted; instead, Ward and Marchetta had expected Craig to terminate Plaintiff.**

68.    Yet, Craig could not bring himself to do so. He recognized that Plaintiff was performing his duties satisfactorily and was also acutely aware that Plaintiff depended on his employment benefits to continue receiving cancer treatment.

69.    To further underscore the extent of Defendant's discriminatory practices, it is important to highlight the role of Corbitt in executing the company's racially motivated agenda. **Corbitt, a Black executive within Defendant's organization, played a central role in the decision to hire Craig.** Within the organization, Corbitt exercises significant influence—particularly in matters involving Black employees—**and no related decisions**

**are made without her involvement.** Corbitt's decision to hire Craig was not incidental; it was deliberate and strategic. **She acted with full awareness of the objective: to install Craig for the purpose of targeting and ultimately terminating Plaintiff.** Now, in an apparent effort to distance herself from this scheme, Defendant and Corbitt are attempting to restructure their organizational chart to create the false impression that Corbitt lacks control over various departments. **But one need not see the hands pulling the puppet strings to recognize who orchestrates the performance**.

### Craig's Admissions Reveal the Truth About the Organization

70.     In an effort to reconcile their differences, Plaintiff and Craig met for lunch. During this meeting, Craig disclosed several revealing and significant statements. He confided to Plaintiff that he had once told Corbitt, **"You do not want real security within the organization—they want the appearance of real security."**

71.     Craig further remarked that if Defendant were genuinely committed to establishing a competent security operation, Ward would never have been appointed as Plaintiff's supervisor. This observation was well-founded, as Ward is responsible for event services and Corbitt oversees human resources—neither of whom possesses the security expertise necessary to manage a facility as complex as an arena.

72.     Craig also advised Plaintiff to "keep his head down" and allow his concerns with Defendant to dissipate quietly. However, Plaintiff refused to remain silent or complacent in the face of injustice and chose instead to stand up against the discriminatory and retaliatory practices he experienced.

**Defendant's Sudden Promotions Reflect a Pattern of Strategic Optics**

**73.**    In a deceptive and disgraceful attempt to silence Black employees within its organization, Defendant has begun promoting Black employees in a sudden and conspicuously performative manner—leaving many within the company shocked.

**74.**    These very individuals had long been eligible for advancement, some for months or even years, yet were consistently overlooked.

**75.**    Now, in the wake of internal uproar over well-documented racial discrimination, Defendant has abruptly shifted course, offering promotions in what appears to be a calculated public relations response rather than a genuine commitment to equity.

**76.**    It must be emphasized that no amount of financial compensation or sudden advancement can undo the harm, humiliation, and emotional toll that Defendant's discriminatory practices have caused.

**FIRST CAUSE OF ACTION**
**(Violation of 42 U.S.C. §1981)**

**77.**    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**78.**    Plaintiff is Black and, as such, is a member of a protected class under Title VII of the Civil Rights Act and 42 U.S.C. § 1981.

**79.**    Plaintiff was employed as Director of Safety, Security, and Risk Management. He held an ASIS International CPP certification and had substantial expertise in organizational risk mitigation.

**80.**    Plaintiff was subjected to adverse employment actions, including demotion, exclusion from team communications, removal from key duties, and threats to his job security.

**81.**    Other non-Black directors who raised concerns or had similar performance records were not demoted, targeted, or removed from projects, suggesting disparate treatment based on race.

**82.**    The adverse treatment occurred shortly after Plaintiff raised concerns about racial bias and organizational misconduct, and was consistent with a broader pattern of discrimination by Defendant's leadership. These facts support an inference that Plaintiff's race and protected activity were motivating factors in Defendant's conduct.

**83.**    Defendant violated Section 1981 by subjecting Plaintiff to repeated and systemic discriminatory treatment.

**84.**    Defendant has a documented history of targeting Black individuals and perpetuating racially biased practices. As previously noted, Defendant deliberately hired Craig—who is Black—for the specific purpose of terminating Plaintiff, enabling them to rely on a common but disingenuous defense: that their actions could not be racist because the decision-maker was also Black.

**85.**    However, Defendant does not subject its non-Black employees to such treatment. Black employees, by contrast, are routinely devalued, marginalized, and dehumanized.

**86.**    Plaintiff's demotion was not performance-based but rather a direct result of his identity as an educated, accomplished Black professional who is respected in his field—qualities that intimidated Defendant and their leadership.

**87.**    As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Section 1981, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering for which he is entitled to an award of monetary damages and other relief.

**88.**    Defendant's unlawful conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff and was done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Racial Discrimination, Disparate Treatment, and Hostile Work**
**Environment in Violation of Title VII of the Civil Rights Act of 1964)**

**89.**    Plaintiff incorporates the foregoing paragraphs by reference, as though fully reproduced herein.

**90.** To state a claim for racial discrimination under Title VII, Plaintiff must allege that (1)

he belongs to a protected class, (2) he was qualified for his position, (3) he was subjected to an adverse employment action, and (4) similarly situated individuals outside his protected class were treated more favorably.

91.    As a Black man, Plaintiff belongs to a protected class under Title VII of the Civil Rights Act of 1964. At all relevant times, Plaintiff was employed by Defendant as defined under Title VII.

92.    Plaintiff held the role of Director of Safety, Security, and Risk Management and maintained all relevant qualifications and certifications.

93.    Plaintiff was demoted, removed from team leadership, excluded from meetings, and subjected to verbal threats and isolation.

94.    Non-Black directors were not demoted or targeted after raising internal concerns or performance issues.

95.    Throughout his tenure, Plaintiff was subjected to disparate treatment, racially motivated discrimination, and a hostile work environment—conditions created and perpetuated by Defendant's agents, including, but not limited to, Ward, Corbitt, Marchetta, Bartelstein, and Ishbia.

96.    Defendant and its agents have demonstrated a consistent pattern of discriminatory conduct and have resorted to unethical and deceptive tactics to conceal such behavior. As previously noted, Defendant deliberately hired Craig—a Black man—with the sole intent of insulating itself from claims of racial bias in the eventual demotion of Plaintiff. Although Plaintiff was not terminated, his demotion was not based on performance or merit.

97.     Rather, it was the result of a coordinated effort by Ward, Corbitt, Marchetta, Bartelstein and Ishbia, who conspired in Craig's hiring and directed him to cultivate a toxic and untenable work environment for Plaintiff. The organization's CEO, Bartelstein, was fully aware of Craig's conduct, yet chose to take no action. Plaintiff repeatedly questioned why no executive intervened to stop the escalating misconduct. It became evident that this was not oversight, but orchestration—an intentional effort by Ward, Corbitt, Marchetta, Bartelstein, and Ishbia to target Plaintiff. The adverse treatment Plaintiff endured was directly tied to his race. Defendant cannot credibly deflect from this reality; the facts speak for themselves.

98.     The adverse treatment occurred after Plaintiff reported discrimination and presented his ESRM report, triggering a series of retaliatory actions carried out by Defendants' executives.

99.     Defendant intentionally discriminated against Plaintiff, creating a hostile work environment and violating his rights under Title VII.

100.    As a direct result of Defendant's unlawful conduct, Plaintiff suffered emotional and professional harm.

101.    Defendant's actions were malicious, oppressive, and undertaken with a conscious disregard for Plaintiff's rights. Plaintiff is entitled to punitive damages in an amount to be proven at trial.

**THIRD CAUSE OF ACTION**
**(Violation of the Family and Medical Leave Act)**

**102.**    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**103.**    To state a claim under the Family and Medical Leave Act, a plaintiff must allege that: (1) they were an eligible employee under the Act; (2) the employer was covered by the Act; (3) they were entitled to take leave; (4) they gave the employer adequate notice of their intention to take leave; and (5) the employer interfered with their FMLA rights or retaliated against them for exercising those rights.

**104.**    Plaintiff was employed by Defendant, which is a covered employer under the FMLA. Plaintiff was an eligible employee, having worked more than 1,250 hours in the 12-month period preceding his leave request. He was diagnosed with cancer and undergoing chemotherapy, qualifying him for medical leave under the FMLA.

**105.**    Plaintiff lawfully exercised his rights under the Family and Medical Leave Act (FMLA) by initiating the leave request process and requesting the necessary documentation.

**106.**    At all relevant times, Plaintiff had been diagnosed with cancer and was actively undergoing chemotherapy while also grappling with significant mental health challenges.

**107.**    Plaintiff began the process of requesting FMLA leave and twice attempted to complete the required documentation. Defendant, through its HR department, was fully aware of Plaintiff's intent to take leave. However, this confidential medical information was disclosed to Craig, who then made threatening statements about Plaintiff's job security,

including: "You can be in Hawaii for all I care, as long as you meet your deliverables," and "Your health issues are self-induced."

108.    These statements were coercive and retaliatory and caused Plaintiff to reasonably fear termination if he pursued medical leave. Defendant's conduct, therefore, interfered with Plaintiff's right to take protected leave and retaliated against him for exercising that right, in violation of the FMLA.

109.    Plaintiff was eligible for FMLA leave. As previously stated, Defendant's actions, through its agent, reflect a willful interference with Plaintiff's FMLA rights and further demonstrate the hostile and unsupportive environment to which he was subjected.

**FOURTH CAUSE OF ACTION**
**(Violation of the Americans with Disabilities Act)**

110.    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

111.    Plaintiff exercised his rights under the Americans with Disabilities Act ("ADA") by initiating the leave request process and requesting the necessary documentation.

112.    At all relevant times, Plaintiff was eligible for protections under the ADA.

113.     As previously stated in the fourth cause of action, Plaintiff had been diagnosed with cancer and was actively undergoing chemotherapy while also grappling with significant mental health challenges.

114.    As stated in the Third Cause of Action, Craig threatened Plaintiff's job security after learning Plaintiff was seeking accommodations and prevented him from continuing with the accommodations request.

**115.**    These statements constituted an explicit and coercive threat, which had the effect of deterring Plaintiff from completing the ADA process and exercising his right to take protected medical leave.

**116.**    Defendant's actions, through its agent, reflect a willful interference with Plaintiff's ADA rights and further demonstrate the hostile and unsupportive environment to which he was subjected.

**FIFTH CAUSE OF ACTION**
**(Retaliation In Violation of Title VII, FMLA, ADA, and 42 U.S.C.**
**§1981)**

**117.**    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**118.**    As previously stated, Plaintiff engaged in multiple protected activities, including filing formal complaints with the EEOC and the ACRD. Plaintiff also exercised his rights under the FMLA and the ADA. In direct response to these protected actions, Defendant engaged in materially adverse actions in retaliation against Plaintiff.

**119.**    This retaliatory behavior included, but was not limited to, excluding Plaintiff from critical group meetings, isolating him from his team members, and denying him access to promotional opportunities for which he was qualified.

**120.**    These adverse actions occurred shortly after Plaintiff's protected activity, creating a clear and compelling inference of retaliatory motive.

**121.**    Defendant's unlawful retaliatory conduct constitutes a willful and wanton violation of Section 1981, was outrageous and malicious, was intended to injure Plaintiff and was

done with conscious disregard of Plaintiff's civil rights, entitling Plaintiff to an award of punitive damages.

## SIXTH CAUSE OF ACTION
### (Violation of Arizona Civil Rights Act)

**122.**    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**123.**    Defendant discriminated against Plaintiff in violation of the Arizona Law Against Discrimination by subjecting him to disparate treatment because of his race, by, inter alia, demoting Plaintiff's position with the Company.

**124.**    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the Arizona Law Against Discrimination, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## SEVENTH CAUSE OF ACTION
### (Retaliation in Violation of Arizona Civil Rights Act)

**125.**    Plaintiff hereby repeats and realleges the allegations in each of the preceding paragraphs as if fully set forth herein.

**126.**    Defendant has violated the Arizona Law Against Discrimination by subjecting Plaintiff to retaliation for his protected complaints and opposition to Defendant's discriminatory comments and practices on the basis of race and ethnicity by, inter alia, demoting Plaintiff's position with the Company.

**127.**    As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of the Arizona Law Against Discrimination, Plaintiff has suffered and continues to suffer severe mental anguish and emotional distress, including but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

## EIGHTH CAUSE OF ACTION
### (Intentional Infliction of Emotional Distress)

**128.**    Plaintiff incorporates by reference the foregoing paragraphs as though fully set forth herein.

**129.**    Plaintiff repeatedly notified Defendant of ongoing racial abuse, harassment, and the hostile work environment pervasive within the organization. Despite these reports, Defendant's agents—including Ward, Marchetta, Corbitt, Bartelstein, and Ishbia—actively participated in a deliberate and extreme scheme to force Plaintiff out of the organization.

**130.**    As previously stated, this scheme included the calculated hiring of Craig, whose role was either to terminate Plaintiff or, at a minimum, pressure him into leaving voluntarily. Defendant's conduct was both intentional and reckless, undertaken with full awareness of its likely consequences.

**131.**    Defendant demonstrated a reckless disregard for the substantial emotional and psychological harm its actions would cause. As a direct result of this scheme, Plaintiff has

suffered severe emotional distress, including pain, anxiety, humiliation, anger, shame, embarrassment, frustration, and fear.

**132.**    Defendant engaged in this conduct maliciously, fraudulently, and oppressively, with the intent to harm Plaintiff and in conscious disregard of Plaintiff's rights. Plaintiff is entitled to recover punitive damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in his favor and against Defendant, containing the following relief:

**A.**    A declaratory judgment that the actions, conduct and practices of Defendant's complained of herein violate the laws of the United States and the State of Arizona;

**B.**    An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

**C.**    An order directing Defendant to place Plaintiff in the position he would have occupied but for Defendant's discriminatory, retaliatory and/or otherwise unlawful treatment of him, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Plaintiff;

**D.**    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all monetary and/or economic damages,

including, but not limited to, the loss of future income, wages, compensation, job security and other benefits of employment;

**E.**    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for all non-monetary and/or compensatory damages, including, but not limited to, compensation for his severe mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

**F.**    An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff for harm to his professional and personal reputation and loss of career fulfillment;

**G.**    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff in an amount to be determined at trial, plus prejudgment interest;

**H.**    An award of punitive damages;

**I.**    An award of costs that Plaintiff has incurred in this action, together with Plaintiff's reasonable attorneys' fees, costs, and expenses to the fullest extent permitted by law; and

**J.**    Such other and further relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury trial on all issues.

**EXECUTED** this 13th day of May 2025.

IBF LAW GROUP, PLLC

By: /s/ Sheree D. Wright
Sheree D. Wright
3101 N. Central Ave, Suite 1250
Phoenix, Arizona 85012
Telephone: (602) 833-1110
Facsimile: (602) 800-5701
E-Mail: sheree@ibflaw.com


**The Law Office of Cortney E. Walters, PLLC**

By: /s/ Cortney E. Walters,
Cortney E. Walters
2719 Hollywood Blvd., Suite A-1969
Hollywood, FL 33020
Telephone: (954) 874-8022
Facsimile: (954) 889-3747
E-Mail: cwalters@cewlawoffice.com


*Attorneys for Plaintiff*